J-A13014-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANDREA KRISTIN GRIFFIN-MCCLOUD | : | |
| | : | |
| Appellant | : | No. 945 WDA 2025 |

Appeal from the Judgment of Sentence Entered June 30, 2025
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0001409-2024

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

MEMORANDUM BY BOWES, J.:                    **FILED: August 7, 2026**

Andrea Kristin Griffin-McCloud appeals from the judgment of sentence of four and one-half to ten years of incarceration for her convictions of aggravated assault and related charges.  Since we conclude that Appellant was entitled to a self-defense jury instruction, we vacate Appellant's judgment of sentence and remand for a new trial.

We glean the following from the certified record.  The assault charges stem from an altercation between Appellant and Cherakie Wells on March 25, 2024, wherein Ms. Wells suffered a laceration to the forehead and a stab wound to the chest.  By way of background, the two women, who both lived in Erie, were amicable acquaintances until 2022, when Appellant began sending Ms. Wells messages over Facebook saying, "Fuck you" and "where you at, I want to fight."  N.T. Jury Trial Day 1, 5/6/25, at 25-26.  Ms. Wells would respond in kind, replying, "F you" and "fuck you back."  *Id*. at 27.

The impetus for the animosity between the two was unclear from the record. Nevertheless, this feud continued and they sporadically sent each other heated messages through Facebook messenger for the next two years, with Appellant thrice challenging Ms. Wells to a fight at Appellant's house. Matters escalated on March 23, 2024, Ms. Wells's birthday, when Appellant and Appellant's cousins sent Facebook messages to Ms. Wells saying, *inter alia*, "fuck your birthday, bookie" and "let's fight[.]" *Id*. at 30-31. Ms. Wells responded: "I'm out of town and I will see you when I get back." *Id*. at 31-32. Appellant and Ms. Wells kept exchanging messages for the next two days.

On the evening of March 25, 2024, Ms. Wells's boyfriend, Dimarius Murel, drove Ms. Wells to Appellant's house. Mr. Murel brought his firearm. When Ms. Wells and Mr. Murel exited the car, they saw Appellant and her cousins Kyelle Jones and Dawnshaya,[1] all of whom knew that Mr. Murel always carried his gun with him. Appellant asked Ms. Wells, "what's up, bitch" and then ran up to her and they began punching each other. *Id*. at 37. Appellant's punches mimicked a stabbing motion as if something was in her hand. Approximately twenty seconds into the fight, Dawnshaya approached Ms. Wells with an extension cord, but Mr. Murel stopped her before she could make contact. He then punched Appellant in the face to stop the fight, and he and Ms. Wells left in their car.

---

[1] Her last name does not appear in the record.

When Ms. Wells went home to take a shower, she had difficulty breathing, discovered a wound to her right breast, and realized the cut on her forehead was open, so Mr. Murel drove her to the hospital. Ms. Wells spent five days in the intensive care unit being treated for two injuries. To her forehead, she sustained "a large laceration about four centimeters long" that "went through the skin and muscle and almost went down to the bone." *Id*. at 102-03. She also had a puncture wound that went through the skin and muscle below her right breast, between her ribs, and lacerated the lung, "which resulted in bleeding into her chest cavity and partial collapse of the lung." *Id*. at 105. The appearance of the breast wound was consistent with one caused by a knife, and "could be life threatening." *Id*. at 107.

Appellant's mother, Kristy McCloud, called the police to report Appellant being attacked. Police were also dispatched to the hospital upon learning of Ms. Wells's wounds. Ms. Wells relayed that she had gotten into an argument with Appellant, who then stabbed her with an unknown object. Detective Sergeant Jason Russell took over the investigation the following morning. Ultimately, the Commonwealth charged Appellant with one count each of attempted homicide, aggravated assault, aggravated assault with a deadly weapon, possession of a weapon, recklessly endangering another person, and disorderly conduct. Mr. Murel was charged in a separate case with aggravated assault, aggravated assault with a deadly weapon, and simple assault for his involvement in the altercation.

Appellant proceeded to a two-day jury trial. The Commonwealth called Ms. Wells, Mr. Murel, Angela McDermott, D.O., Patrolman Jeffrey Parker, and Detective Russell, who testified to the foregoing. According to Mr. Murel, Ms. Wells decided to fight Appellant after Appellant sent "a death threat saying she was going to kill [Ms. Wells] on her birthday." *Id*. at 67. He also explained that individuals in their neighborhood generally do not contact the police for fear of being labeled a snitch. Detective Russell testified that when he advised Appellant that she was being arrested for attempted murder, "she responded, 'yeah, she lucky she ain't dead.'" *Id*. at 121. Additionally, in a subsequent call from the prison that was played for the jury, Appellant stated that she did not regret her actions during the fight.[2]

In her opening statement, Appellant framed her actions as being in self-defense. *Id*. at 20-22. In support, Appellant presented Ms. McCloud and her best friend Au-Taysha Carson as witnesses. Ms. McCloud testified that she believed Ms. Wells wanted to fight Appellant because Appellant had slapped the hand of Ms. Wells's then-four-year-old son in a disciplinary manner at some point in the past. As she described the fight, Ms. Wells, who was standing outside her house, threw a glass bottle or mason jar at Appellant and charged Appellant before the two started to exchange blows. The fistfight

---

[2] The phone call was not included in the certified record transmitted to this Court. Consequently, this Court has not listened to it. Detective Russell highlighted the following statements purportedly made by Appellant: "I'm glad I did what the fuck I did" and that the charges against her should be dropped because Ms. Wells "was picking on me[.]" N.T. Jury Trial Day 1, 5/6/25, at 124.

between Appellant and Ms. Wells then ended when Mr. Murel knocked Appellant unconscious with a single punch. Ms. Wells and Mr. Murel immediately fled, and she did not perceive any blood on Ms. Wells. Ms. McCloud further attested that Appellant succumbed to multiple seizures after Mr. Murel struck her and was emergently transported to the hospital the night of the fight. She explained that Appellant was discharged the following morning under heavy sedation for a concussion and arrested shortly thereafter.

As Ms. Carson relayed the events of that day, Ms. Wells had been sending Appellant messages, threatening to slash her parents' tires and taunting her to come outside by sending pictures she had taken from outside Appellant's house. When Ms. Carson was inside putting her children to bed that evening, she heard yelling and went outside to see Ms. Wells and Mr. Murel. He pointed his firearm at the fence, in Appellant's direction, and threatened to shoot Mr. Jones if he moved from his location by the fence. Shortly thereafter, Ms. Wells ran up to Appellant and struck her in the head with a glass bottle twice before it shattered. According to Ms. Carson, this was the first strike of the fight. Thereafter, the tussle between Appellant and Ms. Wells continued until Mr. Murel punched Appellant and she fell to the ground unconscious.

On the second day of trial, Appellant requested a self-defense instruction. Following an off-the-record discussion, the Commonwealth challenged the instruction on the basis that there was mutual provocation and

no evidence about Appellant's mental state to support that she reasonably believed she was in danger of death or serious bodily injury. In ruling upon the request, the trial court explained that "before the issue of self-defense may be submitted to a jury for consideration a valid claim of self-defense must be made out as a matter of law and that must be made by the trial judge[, who] can look at any evidence that is a part of the case here." N.T. Jury Trial Day 2, 5/7/25, at 11. The court, relying upon this Court's non-precedential decision in **Commonwealth v. Wall**, 317 A.3d 589 (Pa.Super. 2024) (non-precedential decision), determined that both Ms. Wells and Appellant were involved in a "mutual affray" and that neither "was the aggressor versus the other." *Id*. at 12. The court found both women at fault, that Appellant did not violate a duty to retreat, and agreed with the Commonwealth that it had "not seen any evidence that shows that [Appellant] believed she was in imminent danger of death or great bodily harm." *Id*. at 12-13.

The court therefore denied the request but stated that if Appellant testified that she believed she was in such danger, then the court would give the instruction. *Id*. at 16-17 (holding that "there's no question she would get an instruction on that, if that's what her testimony is. But I think we're lacking that at this time and that would be the basis for my reasoning"). After objecting that such a ruling violated her constitutional right not to testify, Appellant decided not to testify and rested her defense.

In rebuttal, the Commonwealth re-called Detective Russell to explain that he did not find any broken glass when he investigated the scene thirty-

six hours after the fight. Additionally, he stated that Ms. Carson had told him that she had not seen a firearm during the incident and did not mention the glass bottle until trial. In the end, the jury acquitted Appellant of attempted murder but otherwise found her guilty as charged. The court sentenced her to concurrent terms of incarceration, the lengthiest of which was four and one-half to ten years for her lead aggravated assault conviction. Appellant filed a motion for post-sentence relief, which the court denied.

This timely appeal followed. Although the court purported to order Appellant to file a concise statement, it failed to specify the address to which the statement could be mailed or advise Appellant that any issue not included shall be deemed waived, in contravention of the requirements set forth in Pa.R.A.P. 1925(b)(3)(iii) and (iv). Nonetheless, Appellant timely submitted a Rule 1925(b) statement. The court authored a responsive opinion. In this Court, Appellant presents a single question: "Did the trial court err when it refused Appellant's request for a self-defense instruction?" Appellant's brief at 8 (unnecessary capitalization omitted).

The ensuing principles guide our disposition of this issue. First, "our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Green*, 273 A.3d 1080, 1084 (Pa.Super. 2022) (cleaned up). Additionally, "the trial court is not required to give every charge that is requested by the

parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal." *Id*. (cleaned up).

Our Crimes Code addresses self-defense as a justification for a crime, providing that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S. § 505(a).

The following pertains particularly to a request for an instruction founded upon that enactment:

> Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made by the trial judge. . . . [T]his Court explained that a valid claim of self defense may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination. However, such evidence from whatever source must speak to three specific elements for a claim of self-defense to be placed in issue for a jury's consideration.

*Green*, 273 A.3d at 1085 (cleaned up). Our High Court has explained this three-part test in the following manner:

> A claim of self-defense (or justification, to use the term employed in the Crimes Code) requires evidence establishing three elements: (a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the defendant did not violate any duty to retreat.

*Commonwealth v. Mouzon*, 53 A.3d 738, 740-41 (Pa. 2012) (cleaned up).

With this framework in mind, we turn to the court's reasoning for denying Appellant's request for a self-defense instruction. The court conceded that Appellant did not violate a duty to retreat but determined there was no evidence "that Appellant believed she was in imminent danger of death or great bodily harm[,]" and, without such, the women were merely engaged "in a mutual affray[.]" Trial Court Opinion, 9/16/25, at 3. Additionally, the court reiterated its reliance upon *Wall* to support its conclusion that the evidence was insufficient to establish a valid claim of self-defense without the testimony of Appellant or another witness.[3]

Appellant, however, contends that all three elements of self-defense were met, thereby entitling her to a jury instruction. *See* Appellant's brief at 34-40. As she recounts, Ms. Carson attested that before the fight began Mr. Murel pointed a gun in Appellant's direction and threatened to shoot her cousin if he moved. Additionally, both Ms. McCloud and Ms. Carson testified that the first blow came from Ms. Wells after she charged Appellant and either threw a glass bottle at her or twice struck her in the head with the bottle, thereby shattering it. Appellant contends that Ms. "Wells'[s] utilization of this

---

[3] We find *Wall* inapposite to the matter at hand because in that case, although initially denied, the trial court ultimately instructed the jury on self-defense after the defendant testified. Here, Appellant did not testify. Although she previously argued like Wall that requiring her to testify to get a self-defense jury instruction violated her constitutional right not to testify, Appellant does not pursue that argument on appeal. Therefore, we do not glean any persuasive authority from our non-precedential decision in *Wall* that is germane to the issue presently before us.

weapon, coupled with [Mr.] Murel's aggressive behavior/stance and pointing of a firearm in Appellant's direction, provides sufficient evidentiary support for the belief that Appellant believed deadly force was necessary during the fight to protect herself against death or serious bodily injury." *Id*. at 36. Thus, she argues that "when [they] introduced deadly weapons into an anticipated fist fight, Appellant did not lose her ability to employ deadly force to save her own life." *Id*. at 37-38.

Appellant posits that the trial court ignored testimony and instead usurped the role of the jury by making a factual determination that the women were simply engaged in a mutual fistfight. *Id*. at 36. Further, she laments that "the trial court determined that both parties were the aggressors, but never considered the impact of [Ms.] Wells and [Mr.] Murel's decision to introduce weapons into the calculation." *Id*. at 38. Finally, in light of Ms. Wells's use of a glass bottle and Mr. Murel threatening to shoot Mr. Jones if he moved, Appellant avers that "there [wa]s evidence of record to show that Appellant did not have a safe avenue of retreat available to her." *Id*. at 39.

The Commonwealth argues in favor of the court's ruling because "Appellant's witnesses' versions of the events were discredited by the Commonwealth on cross-examination." Commonwealth's brief at 10. This contention misconstrues the burden a defendant must meet to be entitled to a self-defense jury instruction.

We reiterate that "if there is any evidence from whatever source that will support [the] three elements [of self-defense,] then the decision as to

whether the claim is a valid one is left to the jury and the jury must be charged properly thereon by the trial court." **Green**, 273 A.3d at 1085 (cleaned up). Stated another way, Appellant did not need to prove self-defense beyond peradventure to obtain the instruction, and the Commonwealth's proffer of evidence tending to disprove self-defense did not negate her right to receive the benefit of that instruction. Rather, in the face of evidence that could support the elements of self-defense, it was for the jury to assess whether the Commonwealth had disproven the justification claim.

As noted, the court denied the request based upon the first two elements. Regarding the first element:

> Our case law has recognized two requisite components to a defendant's state of mind: (1) the defendant's subjective belief that he had an honest, *bona fide* belief that he was in imminent danger, to which expert testimony is admissible; and (2) the objective measurement of that belief, *i.e.*, the reasonableness of that particular belief in light of the facts as they appear, to which expert testimony is inadmissible.

**Commonwealth v. Rivera**, 108 A.3d 779, 792 (Pa.Super. 2014) (cleaned up). Further, our Supreme Court has clarified that "where the original assailant becomes the assaulted, it is he who then has a right of self defense." **Commonwealth v. Edwards**, 292 A.2d 361, 364 (Pa. 1972) (cleaned up). For example, in **Commonwealth v. Samuel**, 590 A.2d 1245 (Pa. 1991), even assuming the defendant was the initial provoker because he displayed a firearm to the victim, "the balance between the parties shifted when [the victim] left the room and [the defendant] retreated to the dining area, setting

down his weapon. [The victim]'s re-entry into the living room with a sawed-off shotgun placed him in the position of being the aggressor." *Id*. at 1249 (footnote omitted).

Regardless of the mutual assent to fisticuffs, someone improperly introduced a weapon into this fistfight. Here, there was testimony that despite the expectation that the fight would be one of hand-to-hand combat, Mr. Murel threatened Appellant and her cousin with a firearm and Ms. Wells struck her with a glass bottle. Thus, it was wholly within the province of the jury to decide whether Appellant first introduced a weapon, based upon the testimony of Ms. Wells and Mr. Murel that they were unarmed before Appellant stabbed Ms. Wells, or that Ms. Wells did so by striking Appellant in the head with a glass bottle and she could not safely retreat because Mr. Murel threateningly brandished a firearm before the fight began. By denying the request for a self-defense jury instruction, the trial court precluded the jury from making that credibility determination.

In **Mouzon**, the defendant, like Appellant, did not testify and was denied a self-defense jury instruction. Our Supreme Court affirmed not because the absence of his testimony or reliance upon inferences was fatal, but because the evidence adduced refuted the reasonableness of any subjective belief:

> Appellee did not testify and describe his subjective thinking, relying instead on inferences from the circumstances as observed by others.
>
> In the absence of specific evidence concerning appellee's subjective beliefs, he appears to proceed under the assumption

that anyone in his circumstance would feel the necessity to employ deadly force in self-defense. Even assuming that this approach is adequate as a theoretical matter to raise an issue of self-defense, the objective circumstances revealed by the actual evidence fatally undermine appellee's position. The evidence was undisputed that appellee carried a concealed, loaded handgun throughout the incident, and at the moment appellee employed deadly force by drawing that weapon and firing twice at King, King was backing away with his hands raised. Absent testimony or some other specific account of what appellee actually believed, the evidence was not sufficient to raise a jury question whether appellee subjectively believed that he had to use deadly force when he twice pulled the trigger.

*Mouzon*, 53 A.3d at 752 (cleaned up). In the matter *sub judice*, the evidence supported a reasonable belief that deadly force was necessary where Mr. Murel pointed a firearm in her direction and threatened to shoot her cousin if he moved, meaning her cousin would not be able to safely intervene if necessary, and Ms. Wells began the agreed-upon fistfight by instead striking her in the head with a glass bottle.

Our review of the record reveals that the trial court made a determination as to whether Appellant had **succeeded** in proving a claim of self-defense, not whether there was some evidence to support a claim of self-defense that the Commonwealth would then seek to convince the jury had been disproved. We are thus constrained to agree with Appellant that the trial court erred in denying her request for a self-defense jury instruction. Failure to provide the instruction prejudiced Appellant because "the trial court usurped the jury's role as factfinder by making its own credibility determinations when it denied Appellant's request for a [self-defense]

instruction and precluded counsel from arguing . . . self-defense." **Green**, 273 A.3d at 1089. Therefore, we vacate Appellant's judgment of sentence and remand for a new trial.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

8/7/2026